[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13091
_____

D.C. Docket No. 9:17-cr-80203-WPD-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOHNNY CLYDE BENJAMIN, JR.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 8, 2020)

Before ED CARNES, Chief Judge, LUCK and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Dr. Johnny Clyde Benjamin, Jr. appeals his convictions for distributing furanyl fentanyl, a controlled substance analogue, in counterfeit oxycodone pills that caused the death of a 34-year-old woman. He challenges his convictions because, he claims, the government failed to prove that he produced and distributed the drugs that caused the death of the victim; the distribution of furanyl fentanyl was not criminalized by Congress until after he distributed it; the trial court failed to properly instruct the jury as to the requirement of scienter; it erred in denying his motion to suppress evidence obtained from a search of his bags at an airport; and the district court abused its discretion in declining to investigate juror misconduct. Finding no merit in any of Benjamin's claims, we affirm.

I.

A.

On March 6, 2018, a grand jury returned a superseding indictment against Benjamin and two co-conspirators, Zachary Stewart and Kevan Slater. The superseding indictment charged the three defendants with (1) one count of conspiring to possess with intent to distribute furanyl fentanyl, a controlled substance analogue, which resulted in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846 (Count One); (2) one count of distributing furanyl fentanyl, a controlled substance analogue, which resulted in death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count Two); and (3) one count of conspiring to

2

possess with intent to distribute hydrocodone and oxycodone, both controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count Seven). The superseding indictment also charged Benjamin alone with (1) one count of attempting to possess with intent to distribute acetyl fentanyl, a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count Three); (2) two counts of possessing firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A) (Counts Four and Six); and (3) one count of possessing with intent to distribute oxycodone, a controlled substance, in violation of 21 U.S.C. § 841(a)(1) (Count Five).

Stewart and Slater testified against Benjamin at trial and each pled guilty to one count of conspiring to possess with intent to distribute furanyl fentanyl, a controlled substance analogue, which resulted in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846; and one count of conspiring to possess with intent to distribute hydrocodone and oxycodone, both controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846. On July 27, 2018, the district court sentenced Stewart to 58 months in prison and Slater to 72 months in prison.

### B.

These are the essential facts adduced at Benjamin's seven-day trial. On September 1, 2016, two Palm Beach County Sheriff's Office ("PBSO") deputies responded to a 911 call at an apartment complex in Wellington, Florida. The

3

deputies found an adult woman, later identified as M.C., unconscious; they performed CPR until fire rescue arrived.  Tragically, those efforts were unsuccessful and M.C. was pronounced dead.  M.C.'s husband told the responding officers that his wife had overdosed on drugs.  The officers recovered prescription pill bottles from M.C.'s bedroom.  One of the bottles had what appeared to be, at first blush, oxycodone -- small blue pills with the letter "M" printed on one side, and the number "30" printed on the other.  Laboratory testing, though, later revealed that those pills contained furanyl fentanyl.

A toxicology report confirmed that M.C.'s blood contained caffeine, furanyl fentanyl, and a compound called 4-ANPP.[1]  The report also found that M.C. had a blood alcohol concentration of .033 -- not much more than one drink's worth of alcohol.  Dr. George Behonick, an expert toxicologist, testified for the government that there is no known safe level of furanyl fentanyl in the blood, nor has the drug been approved for any medical use in the United States.  Dr. Gertrude Juste, an expert forensic pathologist and the medical examiner who performed M.C.'s

---

[1] As described at trial, 4-ANPP "is a compound which is thought to be a precursor or intermediate in the clandestine or illicit manufacture of fentanyl and several other fentanyl analogues," including furanyl fentanyl.

 Mass spectrometry testing of M.C.'s blood also indicated the presence of tramadol, but more specific quantitative analysis found no tramadol at a reporting limit of 0.044 milligrams per liter. The report also indicated there was benzodiazepine in her urine, which suggested M.C. may have taken Xanax at some point before her death.

autopsy, opined that the ingestion of furanyl fentanyl caused M.C.'s death; that M.C.'s blood alcohol level was "insignificant" and "could not explain her death"; and that M.C. suffered from no other, underlying medical condition that could have caused her death.

M.C.'s husband told law enforcement officers that Kevan Slater, a friend of M.C.'s, had given her pills in the past. He also gave them M.C.'s cell phone. The agents found text messages between M.C. and Slater discussing the pills. The agents were also able to place the phone at Slater's residence the night before M.C. died, and thus identified Slater as having given her the fatal pills. Slater admitted giving the counterfeit oxycodone pills to M.C. and agreed to cooperate in the investigation. He told law enforcement that he had been given the pills by Zachary Stewart, and that Stewart told him that Dr. Johnny Benjamin was the source of the pills. Stewart likewise cooperated and confirmed that Benjamin, a spinal surgeon in Vero Beach, Florida, was the source of the pills.

Stewart testified that Dr. Benjamin had planned to manufacture counterfeit oxycodone pills. Benjamin asked Stewart to help him purchase a pill press and explained to Stewart that it would be cheaper to import fentanyl from China than it would be to purchase pharmaceutically manufactured pills in the United States. In April or May 2016, Benjamin gave Stewart an initial batch of counterfeit oxycodone pills. Stewart was supposed to find someone to test the pills because

5

Benjamin wanted to confirm their potency. But Stewart was unable to do so. The pills in the first batch were white, and they looked nothing like real oxycodone pills, which are light blue. Within a week, though, Benjamin gave Stewart a second batch of twenty pills. Stewart gave these pills to Slater for testing. Slater consumed all twenty himself. Slater testified that the pills were "very similar to a pain killer," but their potency was "slightly under what a typical [oxycodone] pill would normally be."

Then, in late August, Benjamin gave Stewart a third batch. Stewart thought these pills looked better than the first two batches -- more like real oxycodone -- and Benjamin told him they were more potent. Once more, Stewart gave the pills to Slater. But this time, Slater didn't keep the pills for himself. Instead, he sold some to M.C. After M.C. died, Slater flushed the remaining pills down a garbage disposal. He then called Stewart to tell him about M.C.'s death. Stewart testified that the news "terrified" him and made him "feel horrible." He said he was fearful he "would be going to jail" and that "other people may be dying, getting hurt from these pills." Stewart immediately relayed the news of M.C.'s death to Benjamin. Benjamin told him not to worry. M.C., Benjamin explained, "was just a piece of paper on a large stack on the desk."

After M.C.'s death, Stewart distanced himself from Benjamin, but, thereafter, as part of his cooperation with law enforcement, Stewart got back in

6

touch with Benjamin and began recording their conversations.  Eventually, Stewart -- at the DEA's direction -- told Benjamin he would be traveling to Atlanta to speak with a drug supplier and to pick up marijuana and prescription pills. Benjamin replied that he was interested in distributing the drugs; he was, as Stewart testified, "eager to find out if the numbers would make sense."

Once Stewart and Benjamin ironed out the details of their arrangement, the DEA contacted Mallinckrodt, a company that manufactures oxycodone pills, and asked it to produce a batch of placebo pills.  The agents gave these pills to Stewart to give to Benjamin, and he did so on October 5, 2017.  Stewart told Benjamin that the pills contained acetyl fentanyl mixed with mannitol and Benadryl, and that they were "the closest thing to" heroin.

The next day, Benjamin traveled with the pills to the Orlando Melbourne International Airport, planning to bring them in his carry-on luggage to Philadelphia.  Before Benjamin arrived, DEA officers reached out for the Melbourne Airport Police Department ("MAPD") to see if its officers could get Benjamin to consent to a search of his bags.  As Benjamin went to pick up his bags from a conveyor belt after passing through TSA screening, Sergeant Patrick Naughton asked Benjamin whether those were his bags and if Naughton could search them.  Benjamin replied, "Yes, sir, you may."  Sergeant Naughton brought Benjamin's bags to a table "ten to 15 feet over to the side" from the security

checkpoint.  Naughton told Benjamin that perhaps the TSA had found "prohibited items in [his] bags, and it could be a bullet or something."  Throughout the encounter, Benjamin remained "calm" and "very cooperative."  The DEA was onsite at the airport in case he declined to consent to the search of his bags.

Sergeant Naughton and Officer Austin Moyer searched Benjamin's bags and found the DEA's counterfeit oxycodone pills.  Benjamin claimed some of the pills were his chemotherapy medication and some were anti-inflammatory medication.  But because Benjamin didn't have a prescription for his "medicine," and because of the vast number of pills -- Naughton estimated there were over 2,000 pills in Benjamin's luggage -- the law enforcement officers confiscated the pills.

On October 12, 2017, Benjamin was arrested, and the DEA executed search warrants on his home, office, and storage unit.  In his home, investigators found five pill bottles, none of which indicated they had been prescribed to Benjamin; a money counter; money bands in $2,000 and $20,000 denominations; and a scale. Subsequent DEA testing confirmed the presence of furanyl fentanyl residue on the scale.  At Benjamin's office, investigators discovered an extensive search history related to fentanyl on his computer.  Benjamin's Google searches included "How much fentanyl in a fake oxy," "fentanyl to oxycodone," and "fentanyl pill."  At Benjamin's storage unit, investigators found Ziploc bags, plastic goggles, a dust mask, rubber gloves, and various parts of a pill press.  Several of those items tested

positive for furanyl fentanyl.  Finally, the DEA confirmed through Benjamin's financial records that he had purchased a pill press, pill mold, and tablet binder.

The jury returned guilty verdicts as to the drug-trafficking charges but acquitted Benjamin of the gun charges.  The district court then sentenced Benjamin to a total term of life in prison.  This timely appeal followed.

## II.

## A.

For starters, we are satisfied that the government introduced sufficient evidence to permit a reasonable jury to find beyond a reasonable doubt that the furanyl fentanyl Benjamin distributed caused M.C.'s death.

We review de novo challenges to the sufficiency of the evidence to support a conviction, taking the evidence and drawing all reasonable inferences in a light most favorable to the government.  United States v. Ochoa, 941 F.3d 1074, 1102 n.18 (11th Cir. 2019).  The Controlled Substances Act ("CSA") makes it illegal for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1).  Section 846 makes an attempt or a conspiracy to commit those acts a federal crime.  Today, furanyl fentanyl is a controlled substance, but at all times relevant to this case, furanyl fentanyl was a controlled substance

analogue.[2]  Section 813(a) requires us to treat controlled substance analogues, "to the extent intended for human consumption," like Schedule I controlled substances "for the purposes of any Federal law."[3]  Section 841 includes this penalty enhancement provision: if a person distributes a Schedule I or II controlled substance, and "death or serious bodily injury results from the use of such substance," then that person "shall be sentenced to a term of imprisonment of not less than twenty years or more than life."  Id. § 841(b)(1)(C).

The Supreme Court has interpreted the penalty enhancement provision's "results from" language to require a showing of but-for causation.  See Burrage v. United States, 571 U.S. 204, 218–19 (2014) (holding that "a defendant cannot be

---

[2] The Controlled Substance Analogue Enforcement Act of 1986 defines a "controlled substance analogue" to mean a substance

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).

[3] At trial, Benjamin stipulated that furanyl fentanyl was, "at all times material to this case," a controlled substance analogue intended for human consumption.

10

liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury"). But-for cause "requires proof 'that the harm would not have occurred in the absence of -- that is, but for -- the defendant's conduct.'" Id. at 211 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 346–47 (2013)). We have explained that "but-for causality does not require that a single factor alone produce the particular result." United States v. Feldman, 936 F.3d 1288, 1311 (11th Cir. 2019). Instead, a jury may find but-for causation "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so -- if, so to speak, it was the straw that broke the camel's back." Id. (emphasis omitted) (quoting Burrage, 571 U.S. at 211).

The government introduced more than enough evidence to allow the jury to find, beyond a reasonable doubt, that the furanyl fentanyl distributed by Benjamin was the but-for cause of M.C.'s death. As we've already noted, the government's expert toxicologist, Dr. Behonick, testified at trial that M.C.'s blood tested positive for furanyl fentanyl, caffeine, and not much more than one drink's worth of alcohol following her death. Dr. Behonick opined that there is no known safe amount of furanyl fentanyl in the blood. Dr. Juste confirmed that there is no known safe level of furanyl fentanyl in the blood; indeed, she said, furanyl fentanyl is so potent it can cause fatal harm to people who so much as touch the drug without wearing

11

gloves. Dr. Juste unambiguously testified that the ingestion of furanyl fentanyl caused M.C.'s death; that M.C. had no underlying medical conditions that could have caused her death; and that M.C. would not have died had she not consumed furanyl fentanyl.

The government also introduced sufficient evidence at trial to link the furanyl fentanyl M.C. consumed to Benjamin. Direct evidence -- including text messages on M.C.'s phone, and the location of M.C.'s phone the evening before her death -- linked M.C.'s counterfeit oxycodone pills to Slater. Slater, in turn, explained that he sold those pills to M.C., that he received them from Stewart, and that Benjamin was the pills' ultimate source. Stewart testified to the same effect at trial. The government supported this with compelling circumstantial evidence, including the pill-manufacturing paraphernalia with traces of furanyl fentanyl found in Benjamin's home and in his storage unit, and the extensive fentanyl-related search history discovered on his office computer. Finally, Benjamin testified on his own behalf and made a series of denials that the jury was entitled to, and obviously did, disbelieve. United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir. 1988).

In short, the evidence was more than sufficient to allow a reasonable jury to conclude that the furanyl fentanyl Benjamin distributed caused M.C.'s death.[4]

### B.

Next, Benjamin argues that the district court lacked subject matter jurisdiction over the first two counts of the indictment because the government failed to charge criminal offenses in those counts. He says the DEA criminalized furanyl fentanyl when it first issued a notice branding the drug a Schedule I narcotic on November 29, 2016. See Schedules of Controlled Substances: Temporary Placement of Furanyl Fentanyl Into Schedule I, 81 Fed. Reg. 85873 (Nov. 29, 2016) (codified at 21 C.F.R. pt. 1308). Until that date, the argument goes, the possession and distribution of furanyl fentanyl were not subject to any criminal penalties.

We review de novo the subject matter jurisdiction of the district court. United States v. Moore, 443 F.3d 790, 793 (11th Cir. 2006). Counts One and Two of the superseding indictment charged Benjamin with violating the Controlled Substance Analogue Enforcement Act of 1986, 21 U.S.C. §§ 802 and 813 (the

---

[4] Benjamin also briefly claims (for the first time on appeal) that the district court failed to properly instruct the jury that, to convict him, it must find he distributed a controlled substance that was a but-for cause of M.C.'s death. We review this claim only for plain error and find it too to be without merit. The district court correctly told the jury that, to convict Benjamin on Count One, it "must find that the controlled substance distributed by the defendant was a but-for cause of M.C.'s death." And again, as to Count Two, the district court charged the jury that to find Benjamin guilty, it must find "that the controlled substance distributed by the defendant was a but-for cause of M.C.'s death."

"Analogue Act"). While Benjamin now claims that the district court lacked subject matter jurisdiction because furanyl fentanyl was not properly characterized as a controlled substance analogue, Benjamin stipulated at trial to the opposite: "that at all times material to this case, furanyl fentanyl was a controlled substance analogue." Benjamin has dressed this claim on appeal in the garb of subject matter jurisdiction, and if he were right, we would be obliged to consider his argument, notwithstanding any stipulation to the contrary. See Belleri v. United States, 712 F.3d 543, 547 (11th Cir. 2013). But the problem for Benjamin is that his claim is not a jurisdictional argument at all. Rather, Benjamin's argument is no more than the claim that he was not guilty of the offenses charged -- that he did not violate the Analogue Act because he did not distribute, nor did he conspire to possess with intent to distribute, a controlled substance analogue. This is "a non-jurisdictional challenge to the sufficiency of the evidence as to" the first two counts of the indictment that "has no bearing on the district court's power to adjudicate [Benjamin's] case or subject matter jurisdiction." United States v. Grimon, 923 F.3d 1302, 1307 (11th Cir. 2019). The district court had subject matter jurisdiction over these drug charges.

## C.

Next, Benjamin claims, for the first time on appeal, that the district court erred by failing to instruct the jury as to the requirement of scienter. According to

14

Benjamin, Counts One and Two of the indictment required the government to prove beyond a reasonable doubt that Benjamin knew furanyl fentanyl was a controlled substance analogue. And the district court's failure to instruct the jury on this point was a non-harmless error that compels reversal. Though we typically review de novo the legal correctness of a jury instruction, United States v. Isnadin, 742 F.3d 1278, 1296 (11th Cir. 2014), Benjamin failed to object to the instructions before the district court, and so our review is only for plain error. "We may correct a plain error only when (1) an error has occurred, (2) the error was plain, and (3) the error affected substantial rights." United States v. DiFalco, 837 F.3d 1207, 1220 (11th Cir. 2016). "An error is plain where it is 'clear' or 'obvious.'" Id. at 1221 (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (alteration adopted) (quoting United States v. Cotton, 535 U.S. 625, 631–32 (2002)). "Under plain-error review, the silent defendant has the burden to show the error plain, prejudicial, and disreputable to the judicial system." Id. (quoting United States v. Monroe, 353 F.3d 1346, 1349–50 (11th Cir. 2003)).

Benjamin cannot meet this exacting standard. The district court instructed the jury that Count One charged Benjamin with "knowingly and willfully"

15

conspiring to possess with intent to distribute furanyl fentanyl.  The court told the jury that § 841(a)(1) "makes it a crime for anyone to knowingly possess furanyl fentanyl with intent to distribute it."  Likewise, the court explained that Count Two charged that Benjamin "knowingly and intentionally" distributed furanyl fentanyl.  The court instructed the jury that, to convict Benjamin on Count Two, it must find that he "knowingly distributed a controlled substance."  The court explained to the jury that the "word 'knowingly' means that an act was done voluntarily and intentionally and not because of a mistake or by accident."  The court also instructed the jury that to act "willfully" means to act "voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law."  The district court made no error in these instructions.

Benjamin argues that the district court was required to instruct the jury that, to convict Benjamin, it must find that he knew furanyl fentanyl was a controlled substance analogue.  But this argument rests on a misreading of McFadden v. United States, 135 S. Ct. 2298 (2015), and of course, the district court need not have accommodated an instruction that would have been contrary to law.  See United States v. Vereen, 920 F.3d 1300, 1306 (11th Cir. 2019) (explaining that, "for the denial of a requested instruction to constitute reversible error, a defendant must establish," inter alia, "that the request correctly stated the law").  As

16

McFadden makes clear, there are two ways the government can prove scienter. One is by showing the defendant knew he was dealing with a controlled substance or controlled substance analogue. McFadden, 135 S. Ct. at 2305. But the second way is "by showing that the defendant knew the identity of the substance he possessed." Id. at 2304. This means the government can prove scienter with "evidence that the defendant knew the specific [controlled substance] analogue he was dealing with, even if he did not know its legal status as an analogue." Id. at 2305. Benjamin points us to no error at all, much less a plain one.

D.

Next, Benjamin claims the district court erred in denying his motion to suppress evidence obtained from the search of his bags at the Orlando Melbourne International Airport. Benjamin disputes the voluntariness of his consent -- he says that, because the search took place at an airport security checkpoint, immediately after the TSA had completed its screening, he did not feel free to refuse the search. He also complains that the MAPD officers used a ruse -- Sergeant Naughton mentioned to him that perhaps the TSA had found ammunition in his luggage -- and that the officers didn't tell Benjamin he could refuse their search.

We use a mixed standard when evaluating a district court's denial of a motion to suppress, reviewing the court's factual findings for clear error and its application of the law to those facts de novo. United States v. Plasencia, 886 F.3d

17

1336, 1342 (11th Cir. 2018) (per curiam).  As we have explained, a warrantless search "does not violate the Fourth Amendment where there is voluntary consent given by a person with authority."  Bates v. Harvey, 518 F.3d 1233, 1243 (11th Cir. 2008).  Consent is voluntary "if it is the product of an 'essentially free and unconstrained choice.'"  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).  Where consent was the basis for a search, the government bears the burden of proving consent was freely given.  See Florida v. Royer, 460 U.S. 491, 497 (1983).  Because voluntariness is "factual and depends on the totality of the circumstances," a district court's assessment that consent was voluntary "will not be disturbed on appeal absent clear error."  Purcell, 236 F.3d at 1281.  When reviewing the totality of the circumstances, we consider "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found."  Id.

These factors all point in the same direction -- that Benjamin voluntarily consented to the search.  The MAPD officers did not coerce Benjamin into providing his consent.  The officers did no more than ask Benjamin whether they could search his bags, and Benjamin cooperated with the MAPD throughout the

18

search.  He was neither in custody nor restrained.  Moreover, the government introduced testimony at a suppression hearing that Benjamin had refused a consent search in the past and was, therefore, familiar with his right to refuse.  And last, the evidence showed that Benjamin believed no incriminating evidence would be found.  Benjamin wore his medical scrubs to the airport, and what could be more innocuous than a doctor traveling with medicine?  Though Benjamin must have known the MAPD would find his pills, he had an excuse at the ready -- the pills were his cancer medication.  See United States v. Spivey, 861 F.3d 1207, 1216 (11th Cir. 2017) ("And 'significantly,' [the defendant] believed that no incriminating evidence would be found -- or at least, nothing she . . . had not prepared to explain away." (quoting United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984))).

That the MAPD made limited use of a ruse does nothing to change our conclusion.  "Deceit," it is true, can "be relevant to voluntariness."  Id. at 1213.  "Because we require 'that the consent was not a function of acquiescence to a claim of lawful authority,' deception invalidates consent when police claim authority they lack."  Id. (quoting United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989)).  "The Fourth Amendment," though, "allows some police deception so long [as] the suspect's 'will was not overborne.'"  Id. at 1214 (alteration adopted) (quoting Schneckloth, 412 U.S. at 226).  Here, Sergeant Naughton told Benjamin

19

that perhaps the TSA had found ammunition in his luggage. This ruse "was a relatively minor deception that created little, if any, coercion." Id. at 1215. Indeed, Naughton made this comment only after Benjamin had already consented to the search of his bags.

The district court found that Benjamin voluntarily consented to the search of his bags at the airport. There is no clear error in that finding. Nor did the district court err in denying the motion to suppress.

E.

Next, Benjamin claims that the district court abused its discretion by declining to investigate juror misconduct. The jury returned its verdict on April 27, 2018. Later that day, the deputy clerk discovered a list of "30 Do's and Don'ts of Jury Deliberations" while cleaning the deliberation room. The district court notified both parties of the list; Benjamin then moved the court to voir dire the jury. Although Benjamin conceded the list was not "inherently prejudicial," he said that its "mere presence in the jury room" showed "at least one juror ignored the Court's instructions and conducted at least some outside research regarding a juror's duties." The district court denied the motion. Here are the list's commandments, in their entirety:

1. Do encourage everyone to share their thoughts.
2. Don't be afraid of silences.
3. Do remind people that all opinions are valid.
4. Don't let people talk over each other.

20

5.  Do consult the exhibits in evaluation of the state's case.
6.  Don't damage the exhibits.
7.  Do re-read the instructions periodically throughout deliberations.
8.  Don't ignore the law.
9.  Do consult your notes.
10.  Don't let another juror be your memory.
11.  Do ask questions of the judge.
12.  Don't try to fill in the blanks with conjecture.
13.  Do judge whether the state proved their case.
14.  Don't judge innocence.
15.  Do take into account how you feel about the testimony the witnesses gave.
16.  Don't let your personal opinions about the judge or the lawyers in the case influence your judgment.
17.  Do remember that a defendant is innocent until proven guilty by the state.
18.  Don't let the way a defendant looks or how they are dressed affect your verdict.
19.  Do fault a states attorney for not putting up a strong case.
20.  Don't fault a defendant for not putting up a defense.
21.  Do change your vote if you change your mind.
22.  Don't change your vote just to be done with deliberations.
23.  Do convict someone if the state provided credible evidence proving they did it.
24.  Don't convict someone because you think they probably did it.
25.  Do remember that reasonable doubt is based on your sense of reason and not someone else's.
26.  Don't choose a verdict that you do not feel confident about.
27.  Do focus completely on your present case.
28.  Don't try to right past wrongs.
29.  Do give justice.
30.  Don't give up.

The district court did not abuse its considerable discretion by declining to investigate further. "Any challenge to the district court's investigation of juror

21

misconduct must be viewed in the context of the broad discretion afforded a trial judge confronted with such an allegation" -- discretion that "extends even to the initial decision of whether to interrogate the jurors." United States v. Augustin, 661 F.3d 1105, 1129 (11th Cir. 2011) (per curiam) (alteration adopted) (quoting United States v. Yonn, 702 F.2d 1341, 1344–45 (11th Cir. 1983)). "[W]here a party alleges that the jury was subject to extrinsic influence, we have held that a district court has a duty to investigate 'only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.'" United States v. Brown, 934 F.3d 1278, 1303 (11th Cir. 2019) (quoting United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990)). We require that the defendant "do more than speculate; he must show 'clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred.'" Cuthel, 903 F.2d at 1383 (quoting United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989)); see also United States v. Venske, 296 F.3d 1284, 1290 (11th Cir. 2002) (explaining that a district court does not err in declining to investigate juror misconduct when the defendant cannot show that the jurors were influenced by external sources).

Benjamin has not made the requisite showing. Benjamin only speculates that the jury improperly viewed prejudicial information. But the list is not, as Benjamin conceded to the district court, "inherently prejudicial." The list makes

22

no mention of any of the particulars of Benjamin's case or the evidence presented at trial. Nor is there any indication that a jury reading this list of do's and don'ts would be more likely to vote to convict. Because Benjamin cannot point to "clear, strong, substantial and incontrovertible evidence," Cuthel, 903 F.2d at 1383 (quoting Ianniello, 866 F.2d at 543), that the jury considered extraneous, prejudicial information, "the district court did not abuse its discretion in failing to investigate it further." Brown, 934 F.3d at 1304.

## F.

Finally, Benjamin argues cumulative error. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless error) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Margarita Garcia, 906 F.3d 1255, 1280 (11th Cir. 2018) (quoting United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005), abrogated in part on other grounds by Davis v. Washington, 547 U.S. 813, 821 (2006)). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Id. (quoting Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012)).

Because Benjamin has not pointed us to any error in his trial, his argument that all of his claimed errors, when taken together, compel reversal necessarily fails.  See Morris, 677 F.3d at 1132 ("[W]here there is no error in any of the trial court's rulings, the argument that cumulative trial error requires that this Court reverse the defendant's convictions is without merit." (alterations adopted and quotation omitted)).

**AFFIRMED.**