[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12782

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ENRIQUE MIRANDA MARTINEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:21-cr-00039-TFM-B-1

_____

Before JORDAN, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

Enrique Miranda Martinez appeals his convictions for conspiracy to possess with intent to distribute methamphetamine and possession with intent to distribute methamphetamine, challenging the denial of his motion to suppress evidence obtained by law enforcement officers during a traffic stop.  For the reasons stated below, we affirm.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

On June 23, 2020, Martinez and his codefendant, Yuri Maikel Hernandez Perez ("Hernandez"), were travelling in a black Mercedes SUV going eastbound on I-10 in Baldwin County, Alabama. Around mile marker 56, Officer Stacey McElroy of the Baldwin County Sheriff's Office ("BCSO") saw the Mercedes "approaching him slowly" and "reluctant[ly] pass" his patrol car.  As the Mercedes passed, McElroy looked into the vehicle and believed the driver—later identified as Martinez—appeared rigid and had a tight grip on the steering wheel.  McElroy noted Martinez's demeanor and considered it to be indicative of a "freeze response" commonly displayed by individuals who may be engaging in criminal activity.

Martinez changed lanes approximately 35-45 feet in front of McElroy's police cruiser, which was less than the 120 feet that McElroy estimated was necessary under Alabama Code

§ 32-5A-88.[1]  McElroy ran the vehicle's registration through a law enforcement database and discovered that the registered owner's driver's license had expired, which prompted McElroy to initiate a traffic stop.

Upon approaching the vehicle, McElroy told Martinez and Hernandez that he had stopped them because Martinez was "way too close" to McElroy's police cruiser when he changed lanes. McElroy asked Hernandez in English, "Is this your car?" and Hernandez seemed to struggle with a response, leading McElroy to ask again in Spanish, "¿Es su carro?"  Hernandez replied, "no" and gave McElroy the vehicle's registration.

McElroy thought he saw Martinez's right hand shaking as he handed over his driver's license and he believed Martinez seemed nervous.  Prior to the traffic stop, McElroy already had used the law enforcement database to confirm the vehicle's registered owner, who turned out not to be Martinez.  McElroy asked Martinez if he spoke English or understood English, and Martinez replied, "a little."

Through the passenger side window, McElroy noticed an Igloo cooler in the backseat that appeared to have a pry mark on the right front lip of the liner.  He took a mental note of the cooler

---

[1] "Whenever any highway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  *See* Ala. Code § 32-5A-88.

because he had previously seen drug traffickers remove the lining from similar coolers and conceal narcotics or other contraband where the insulation had once been located.

McElroy then asked Martinez to step out of the vehicle and stand by the police cruiser parked behind the Mercedes.  As Martinez exited the vehicle, McElroy began questioning Hernandez about where he and Martinez were coming from, to which Hernandez responded, "Pensacola, Florida."  McElroy found Hernandez's response suspicious because the vehicle had been travelling toward, not from, Pensacola at the time of the traffic stop.  When questioned about their intended destination, Hernandez initially said they were going to Orlando, Florida, but when McElroy tried to confirm Hernandez's answer, Hernandez responded instead that they were going to Clearwater, Florida.  After some back and forth in a mixture of Spanish and English, McElroy asked Hernandez, "Where are you coming from?," to which Hernandez replied, "No comprendo."  McElroy continued to question Hernandez in Spanish, but Hernandez again responded, "No comprendo."

Once McElroy finished questioning Hernandez, he returned to his police cruiser.  As soon as McElroy entered his cruiser, around five minutes into the traffic stop, McElroy told Martinez, "no tickets, okay," in an effort to calm Martinez's nerves and continue his investigation.  McElroy then continued to question Martinez, asking, in English, "[W]here are you coming from?"  Martinez paused and began looking off to the side while not answering the question.  McElroy then opened the translation application

"Google Translate" on his phone and used it to communicate with Martinez, who responded to the questions in Spanish. McElroy asked Martinez out loud in Spanish, "Where are you coming from?" After both hearing and reading the question in Spanish, Martinez replied, "Texas." McElroy asked Martinez, in Spanish, how many days he had spent in Texas, and Martinez replied, "Dos."

After McElroy asked Martinez in English what city he stayed in, McElroy entered into Google Translate, "What city did you go to in Texas?" Martinez again paused and looked off to the side, but he eventually responded, "Houston," after McElroy listed numerous Texas cities. Using Google Translate, McElroy asked Martinez what he was doing in Houston, and Martinez first stated he went to the airport. He then stated that he had gone to see a baseball game, which McElroy found suspicious because the COVID-19 pandemic had caused most sporting events to be canceled. McElroy also used Google Translate to ask Martinez where he had stayed in Houston, to which Martinez responded that he had stayed at a motel and in his car.

During this interaction, McElroy was running Martinez's information through his patrol car computer, and he called for additional officers as backup. After running the vehicle's license plates through a database, he discovered that, two days earlier, the vehicle had been spotted west of San Antonio, Texas, approximately six hours away from Houston. Corporal Jason Kolbe then arrived on the scene. McElroy asked Kolbe if he had a translator with him

because Martinez's story did not make sense, and he could not "hear what [Martinez] was saying."

McElroy proceeded to ask Martinez, using a mix of Spanish and English, if he had visited any other states, such as California, Arizona, or New Mexico, and Martinez said, "no" and "only Texas." When asked if he had visited San Antonio, Martinez looked down and did not answer. Meanwhile, Kolbe approached Hernandez, who had remained in the Mercedes. When Kolbe returned to McElroy's cruiser, Kolbe relayed that Hernandez had informed him that he and Martinez had gone to Las Vegas to "pick up cars."

Kolbe then questioned Martinez in a mixture of Spanish and English. Kolbe asked Martinez if he had been to Las Vegas, and Martinez initially said, "no." However, when Kolbe used Google Translate to ask the same question, Martinez stated he had been to both Las Vegas and Texas and stayed in both for two days for "sports." At first, Martinez could not remember which baseball teams he saw play in Las Vegas, and then said he watched the Marlins play, but he could not remember who they played against. McElroy commented that Martinez's answers were "all over the place."

Kolbe then asked, in Spanish, if Martinez had drugs in the car. Martinez shook his head "no," with Kolbe and McElroy remarking that Martinez had taken a "big swallow" before he answered. McElroy then requested permission to search the Mercedes, asking, "¿Me permite registrar vehiculo?" and added "Is

okay, no problemo?" Martinez nodded and responded "yeah" and "no problemo." After walking back over to the Mercedes, McElroy asked Hernandez in Spanish, "¿Amigo, hay no drogas en [el] carro? ¿Marihuana, cocaína, metanfetamina, heroína?" to which Hernandez replied "no." McElroy then asked Hernandez for permission to search the vehicle, posing the same question as he had to Martinez—"¿Me permite registrar vehiculo?"—to which Hernandez replied, "sí." At that point, a different officer had already opened the rear hatch of the SUV to access the trunk area. McElroy asked Hernandez, "¿No armas? ¿No mucho dinero?", to which Hernandez also replied "no."

Officers proceeded to search the vehicle, with Kolbe examining the cooler and noting that the interior lining had been "pried out" from the outer shell. After confirming that the insulation had been removed from the cooler and replaced with what appeared to be contraband, Kolbe instructed the other officers to put Martinez and Hernandez in handcuffs. Upon further inspection of the cooler, McElroy identified what he believed to be methamphetamine concealed inside the inner lining of the cooler where the insulation had been located. The officers placed Martinez and Hernandez under arrest. Ultimately, around eight pounds of methamphetamine were recovered from the cooler.

Thereafter, in 2021, a federal grand jury indicted Martinez and Hernandez with conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 2). They jointly moved to suppress the evidence law enforcement obtained during the traffic stop, arguing that the length of the stop was unconstitutional and that, due to the language barrier between them and the officers, their apparent consent to search the vehicle was invalid.

The district court held a hearing on the motion to suppress and entered into evidence McElroy's body camera footage, which supported his account of the traffic stop. McElroy testified during the hearing that he had been a law enforcement officer since 1998; that he had specialized training in criminal interdiction, including human behavior, locating hidden compartments in vehicles, and roadside interviews; and that he had attended a three-day class called "Survival Spanish for Police Officers" that involved speaking Spanish in different scenarios, many of which were traffic stops. He stated that he had developed some Spanish comprehension as part of his on-the-job training and that, even though he was "not fluent by any means," he knew enough Spanish "to ask a few phrases during a traffic stop." McElroy further testified that he had been trained to ask "¿Me permite registrar vehiculo?" when requesting permission to search a vehicle, and he had used that phrase many times over the years.

On cross-examination, McElroy stated that it would not surprise him to know that the first definition of the verb "registrar" in a Spanish dictionary is "[to] register." However, McElroy indicated that, in context, a Spanish-speaking person would not interpret the

question "¿Me permite registrar vehiculo?" as "[M]ay I register your vehicle?" McElroy acknowledged that he had never entered the phrase "¿Me permite registrar vehiculo?" into Google Translate and he did not know that the application translated that phrase as, "[A]llow vehicle registration?"

Amber Westfall, a Drug Enforcement Administration ("DEA") special agent, testified that she had used "DEA-88A," a Spanish language consent-to-search form, "at least 30 to 40 times" when requesting consent to search from Spanish-speaking individuals. The DEA-88A form used "registrar" to ask for consent to search in the Spanish language, and she did not recall anyone ever being confused by that term. She acknowledged that she was not a native Spanish speaker and that it was her regular practice to have a Spanish speaker available when seeking to obtain consent.

Juan Gastaliturri, a Spanish-speaking Customs and Border Protection Officer assigned to Homeland Security Investigations, also testified. Based on his professional background, training, and experience, he believed that "registrar" was an appropriate verb for McElroy to use when asking a Spanish speaker for consent to search a vehicle, and he did not recall anyone ever misunderstanding the term "registrar" in that context. He stated that he had made more than a thousand consent-to-search requests during his law enforcement career, and he believed there was no question after watching the body camera footage that both Martinez and Hernandez understood that McElroy had asked for permission to search the vehicle when they responded affirmatively to the question. On

cross-examination, he explained he would use the phrase, "[¿]Puedo registrar tu vehiculo?" to ask someone for consent to search their car, but he still believed that the phrase that McElroy used was not confusing.

Raymond Ables, Jr., a state-certified court interpreter, testified for the defense. Ables stated that he had not seen the term "registrar" commonly interpreted as "to search" and that "revisar" was the more commonly used word. According to Ables, one of his colleagues in Cuba had informed him that no one in Cuba would understand "registrar" to mean "search." He explained that the phrase "registrar vehiculo" was more commonly used in the United States and was rarely used in Latin American countries. Ables believed that, while he understood the meaning of "¿Me permite registrar vehiculo?" due to his court experience and general knowledge, someone unfamiliar with "how things work in this country" might not understand it. Yet, during his cross-examination, Ables agreed that, in context, there was "no confusion in [his] mind as to what [McElroy] was asking."

Dr. Damian Chase Wilson also testified for the defense as an expert witness in language acquisition, pragmatics, and sociolinguistics. He considered the phrase, "¿Me permite registrar vehiculo?" to be "highly problematic" and believed that "there was enough confusion to argue against saying that [the officers] clearly obtained consent." He opined that Hernandez could have perceived the phrase to be a question about the vehicle's registration rather than a question about permission to search, and the "high-

stakes" nature of the interaction may have exacerbated the language issue. He stated that the DEA-88A consent-to-search form had minimal value in determining whether a Spanish speaker would have understood McElroy to be requesting permission to search the vehicle because the form included other information that placed the four-word phrase into context, lessening the potential for confusion. Dr. Wilson further noted that he personally preferred "revisar" instead of "registrar" to eliminate possible confusion.

The district court denied the motion to suppress the drug evidence. First, based on McElroy's testimony and the body camera footage, the court found that McElroy had reasonable suspicion to justify the traffic stop based upon the observed traffic violation. The court then found that the officers did not unjustifiably prolong the traffic stop to the point where Martinez's Fourth Amendment rights were violated. The court explained that McElroy had reasonable suspicion to prolong the stop based on his interaction with Martinez and Hernandez and his observation of the cooler, and up until the point that McElroy developed such suspicion, all of his questions were focused on furthering the initial purpose of the stop. Finally, the court found that Martinez validly consented to the search of the vehicle. The court noted the potentially problematic nature of using the term "registrar" when asking for consent to search the vehicle, but determined that, based on the totality of the circumstances and the parties' expert testimony, Martinez understood that McElroy was asking to search his vehicle. Consequently, the district court denied the motion to suppress.

The case then proceeded to trial, where Martinez testified in his own defense through an interpreter.  He testified that he was from Cuba and that he came to the United States in 2011.  He had been living in Miami, Florida for about nine years and worked in the areas of construction, painting, moving, and garbage disposal. He described Hernandez as a friend whom he had known for about five years.  Although Martinez could not "remember the places really well," he recalled that he and Hernandez had gone through maybe Texas and Tucson, Arizona.  Martinez did not have his own vehicle and did not know who owned the Mercedes, and he thought Hernandez had rented the car.  He denied knowing about the methamphetamine in the cooler or having anything to do with why it had been placed there.  Martinez also denied being nervous during the traffic stop and stated that he just felt hot due to the weather.  Martinez never indicated at any point during his testimony that he was confused by McElroy's questions or by the word "registrar" when McElroy requested permission to search the car.

A jury found Martinez guilty of Counts 1 and 2.  The district court sentenced him to 240 months' imprisonment on both counts, to be served concurrently, followed by a 60-month term of supervised release.  Martinez timely appealed his conviction.

## II.    STANDARD OF REVIEW

We review the district court's denial of a motion to suppress evidence under a mixed standard, reviewing the district court's factual findings for clear error and the court's application of the law to the facts *de novo*. *United States v. Lewis*, 674 F.3d 1298, 1302-03 (11th

Cir. 2012).  Under clear error review, if "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003) (quotations marks omitted).

We give substantial deference to the district court's explicit and implicit credibility determinations and construe all facts in the light most favorable to the prevailing party. *Lewis*, 674 F.3d at 1303. We must accept the version of events adopted by the district court "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (internal quotation marks omitted).  In reviewing a denial of a motion to suppress, we are not limited to the evidence presented at the hearing on the motion to suppress, and we instead review the entire record, including trial testimony. *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

## III.    DISCUSSION

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  Under the exclusionary rule, evidence cannot be used against a defendant in a criminal trial where that evidence was obtained through an encounter with law enforcement officers that violated the Fourth Amendment. *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

A traffic stop is a seizure within the meaning of the Fourth Amendment, "even if only for a brief period and for a limited purpose." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  An

officer needs only a reasonable suspicion, not probable cause, to justify an automobile stop that is based on a traffic violation. *United States v. Campbell*, 26 F.4th 860, 880 n.15 (11th Cir. 2022) (*en banc*) (stating that "the Supreme Court has . . . made clear that reasonable suspicion is all that is required [to justify a traffic stop based on a traffic violation]" (citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014))).

### A. Duration of the Stop

Even when officers have a reasonable suspicion to make a traffic stop, "they do not have unfettered authority to detain a person indefinitely." *Id.* at 881. "[T]he tolerable duration of police inquires in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (internal quotation marks and brackets omitted). Officers may also ask a driver about their travel plans. *Campbell*, 26 F.4th at 885.

However, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. Thus, during the traffic stop, the officer may not ask questions that are obviously unrelated

to the purpose of the traffic stop, such as questions about general criminal activity or drug trafficking. *Campbell*, 26 F.4th at 885; *see also Rodriguez*, 575 U.S. at 357. However, "[q]uestions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional traffic stop." *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001).

While a traffic stop must not last longer "than is necessary to effectuate the purpose of the stop," an officer may nevertheless detain a "driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *United States v. Ramirez*, 476 F.3d 1231, 1237 (11th Cir. 2007) (internal quotation marks omitted). The existence of reasonable suspicion permits an officer to "prolong[] the traffic stop to investigate further." *United States v. Spoerke*, 568 F.3d 1236, 1248-49 (11th Cir. 2009).

The validity of an officer's "[r]easonable suspicion is determined from the totality of the circumstances and from the collective knowledge of all the officers involved in the stop." *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir.1989) (internal citation omitted). Those factors include (1) "having no proof of ownership of the vehicle," (2) "having no proof of authority to operate the vehicle," and (3) "inconsistent statements about destination." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999). In particular, "the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning" because it can give rise to an

"objectively reasonable suspicion that the vehicle may be stolen." *Id.* (quotation marks omitted); *see also Spoerke*, 568 F.3d at 1248-49 (holding that a district court did not err in denying the defendant's motion to suppress when the officer prolonged a valid traffic stop after he saw, in plain view, contraband inside the vehicle, particularly given the nervous demeanor of the defendant, his passengers, and the items they carried that made it appear they had just engaged in a burglary).

Martinez argues that the district court clearly erred when it concluded that the officers did not unreasonably delay the traffic stop. He contends that, at the moment McElroy stated he was not going to give Martinez any tickets, the traffic stop should have ended and extending the stop beyond that point violated the Fourth Amendment.

Here, the district court did not err in finding that the traffic stop was not unreasonably prolonged. When McElroy first approached Martinez's vehicle, he asked appropriate, traffic-stop related questions. *Campbell*, 26 F.4th at 885; *see also Rodriguez*, 575 U.S. at 355. During this relevant questioning, McElroy noticed a suspicious cooler in plain view in the backseat. McElroy testified that he noticed the pry marks on the cooler and knew that he had seen such tactics used before by drug traffickers to hide contraband. This, coupled with McElroy's observations of Martinez's and Hernandez's nervous demeanor and their inability to give a straight answer as to their travel plans, gave McElroy enough reasonable suspicion to extend the traffic stop. *Ramirez*, 476 F.3d at 1237;

*Spoerke*, 568 F.3d at 1248-49; *Pruitt*, 174 F.3d at 1220.  Thus, the district court did not clearly err in making factual findings supporting the conclusion that McElroy did not unreasonably extend the traffic stop, and the district court did not err in denying the motion to suppress on that ground.

### B. Consent for the Search

As noted, the "district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error."  *Purcell*, 236 F.3d at 1281.  Because clear error review is highly deferential, "[a]s long as the district court's findings are plausible, we may not reverse the district court even if we would have decided the case differently."  *McPhee*, 336 F.3d at 1275 (quotation marks omitted).

Warrantless searches do not violate the Fourth Amendment where consent to search has been voluntarily "given by a person with authority."  *United States v. Benjamin*, 958 F.3d 1124, 1134 (11th Cir. 2020) (internal quotation marks omitted).  Officers "conducting a routine traffic stop may request consent to search the vehicle."  *Purcell*, 236 F.3d at 1281.  Whether an individual voluntarily gave consent to a search is judged by the totality of the circumstances, and consent is voluntary when it was "the product of an essentially free and unconstrained choice."  *Benjamin*, 958 F.3d at 1134 (internal quotation marks omitted).

The district court may consider several factors when assessing the voluntariness of consent, including: (1) the use of coercive law enforcement procedures; (2) the extent of the individual's

cooperation with the officers; (3) the individual's awareness of his right to refuse consent to search; (4) the individual's education and intelligence; and (5) the individual's belief that no incriminating evidence will be found. *Purcell*, 236 F.3d at 1281. Where consent was the basis for a search, "the government bears the burden of proving consent was freely given." *Benjamin*, 958 F.3d at 1134.

Martinez argues that the warrantless search of his car was unconstitutional because he did not voluntarily give consent to the officers to search. He contends that there was a clear language barrier between himself and the officers such that he could not understand their questions and knowingly and voluntarily consent to a search, especially when they used the term "registrar".

Here, the district court did not clearly err in determining that Martinez gave knowing and voluntary consent to the vehicle search. Although the use of the term "registrar" on its own can be confusing to native Spanish speakers,[2] when viewing the evidence in the light most favorable to the government, the context of its use in this instance shows that Martinez understood that McElroy was asking to search the vehicle. The record evidence demonstrates that McElroy had been trained to use this term when asking Spanish speakers for consent to search, and that other experts in

---

[2] The Fifth Circuit has noted its "concern[]" about law enforcement officers using the term "registrar" to ask Spanish speaking individuals for consent to search, explaining that the term "has potential to be very confusing[,] . . . especially . . . in the context of a vehicle stop." *United States v. Banuelos-Romero*, 597 F.3d 763, 769 n.2 (5th Cir. 2010). We take this moment to also express our concern about the use of the term "registrar" in this context.

the field believed using the term in this context was appropriate. Even Martinez's expert witnesses stated that, in context of a traffic stop, it was evident McElroy was asking to search the vehicle. Finally, the record evidence did not establish that officers used any coercive tactics and Martinez appeared to be openly cooperating with officers during the stop. Moreover, at trial, Martinez testified that he did not know methamphetamine was in the cooler, showing that he did not believe incriminating evidence would be found by officers, and he did not indicate that he was confused or misunderstood any interactions during the stop. *See Newsome*, 475 F.3d at 1224. These facts weigh in favor of affirming the district court's finding that Martinez understood McElroy's question and voluntarily consented to the search. *Purcell*, 236 F.3d at 1281. As such, the district court's view of the evidence was not implausible, and we affirm the district court's denial of Martinez's motion to suppress on this ground. *McPhee*, 336 F.3d at 1275.

## IV.    CONCLUSION

For the reasons set forth above, the district court's denial of Martinez's motion to suppress is **AFFIRMED.**